UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 09-CR-0108 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| WILLIAM GARFIELD SANDISON (1) and CURTIS ALAN MARTINSON (3), | |
| Defendants. | |

John R. Marti and Ann M. Anaya, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

Mark D. Larsen, LINDQUIST & VENNUM PLLP, for defendant William Garfield Sandison.

William Michael, Jr., DORSEY & WHITNEY LLP, for defendant Curtis Alan Martinson.

Defendants William Garfield Sandison and Curtis Alan Martinson pleaded guilty to conspiring to commit bank fraud in connection with the failure of a real-estate development known as the Ramsey Town Center ("RTC"). The parties agree that Sandison and Martinson committed bank fraud. But the parties disagree about the amount of loss caused by that bank fraud — a crucial factor in determining the length of the sentences recommended by the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"). The government puts the amount of loss at $6,617,000, while the defendants put it at zero. The parties also dispute a number of other sentencing factors, but those disputes are largely overshadowed by the dispute over the amount of loss.

The Sentencing Guidelines themselves contemplate that, in an unusual case, a defendant can commit bank fraud without causing any loss.  *See* USSG § 2B1.1 cmt. n. 3(E).  For the reasons described below, the Court finds that this is just such a case.  Although the defendants successfully executed a scheme to defraud a number of banks, the defendants did not cause those banks to lose any money.  Therefore, the Court agrees with Sandison and Martinson that, for purposes of the Sentencing Guidelines, the amount of loss in this case is zero.

## I.  BACKGROUND

### A.  Factual Background

Sandison was the president, and Martinson was the vice president, of Community National Bank ("CNB").  CNB arranged financing for the RTC — a $1.3 billion development that was intended to create a town center of residential, commercial, retail, office, and civic buildings for the growing city of Ramsey, Minnesota.  This case arises out of a series of loans that funded the RTC before the project collapsed in about 2006.

To finance the RTC, CNB arranged and administered a participation loan, in which multiple banks jointly funded a $35 million loan to the developer.  As it turned out, the participation loan was grossly inadequate for the RTC's needs.  Sandison and Martinson therefore arranged to loan more money to the developer.  First, Sandison (as well as his son and another CNB officer) personally issued a $990,000 line of credit to the developer, and secured that line of credit by placing a mortgage on RTC property.  Sandison did not tell any of the participating banks about the loan or the mortgage, even though he was required to do so under the participation-loan agreements.  Later, Sandison and Martinson (and others) personally loaned an additional $6 million to the developer and secured that loan with yet another mortgage.

Sandison and Martinson informed the participating banks of this loan and mortgage, but they did so in an incomplete and misleading manner.

Sandison and Martinson ensured that the loans that they and their friends personally extended to the RTC developer — $617,000 that was advanced against the $990,000 line of credit, and the $6 million loan —  would be repaid before the $35 million participation loan.  The participating banks did not know that Sandison and Martinson had essentially cut in line by obliging the RTC developer to repay their loans before the participation loan.  When the RTC went into foreclosure, all of the participating banks suffered large losses on the $35 million participation loan, but Sandison and Martinson emerged largely unscathed.  Because of the way that they had manipulated RTC's repayment obligations, Sandison and Martinson — unlike the participating banks — got their money back before the RTC project collapsed.

The parties are represented by excellent attorneys, and those attorneys have worked hard to reach a stipulation regarding the relevant details of the crimes committed by Sandison and Martinson.  The Court is grateful for the parties' assistance.  The parties' stipulation is as follows:

> 1.  Participation loans are loans made by multiple lenders to a single borrower.  Several banks jointly fund a large loan that exceeds the lending capacity of a single bank.  One of the banks is designated as the lead bank and then recruits other banks to participate and share the risks and profits.  The lead bank, acting as an agent for the other banks, originates the loan, takes responsibility for the loan servicing of the participation loan, organizes and manages the participation, and deals directly with the borrower.

> 2.  Beginning in 2003, CNB solicited 20 other financial institutions to participate in financing the Ramsey Town Center development through the lending of $35 million to Ramsey Town Center, LLC, ("RTC") with an option of extending an additional $15 million from a revolving line of credit.  The RTC could draw on the $15 million line of credit once it made payments on the

$35 million loan.  Payments on the $35 million loan triggered the ability to draw a corresponding amount from the $15 million line of credit (e.g., a $6 million payment to the Lender on the $35 million loan authorized RTC to draw $6 million on the line of credit).  Such draws on [] the line of credit were not to exceed $15 million.  RTC was entitled to borrow a total of $50 million under this loan arrangement (i.e., the $35 million original loan plus a total of $15 million in additional draws on the line of credit).  The loan agreement provided that loan proceeds could be used for "acquisition of real property; construction of streets, easements, structures, infrastructure, and landscaping; incidental development costs; and such other expenses as are necessary and convenient for the development of real property . . . advances shall be limited to one per month . . . [.]  In order for Lender to make advances or re-advances on the Loan from time to time Borrower must first provide to Lender all applicable documentation . . . .  Applicable documentation may vary depending on whether it is an advance for construction costs or other costs such as development costs, which are necessary for the completion of the Project[."]  Loan Agreement at 1-3.  The defendants provided the Participating Banks with a credit request which stated that, "After the initial advance for land acquisition, including soft-costs to-date, disbursements will be allowed only for project improvements . . . [.]  Prior to any disbursement, the project[']s lead engineering firm shall certify in writing to the Bank the progress of improvement at the conclusion of each stage of construction and the dollar amount necessary to pay for the certified improvement[."]  Ramsey Town Center LLC Credit Request.

3.  CNB, acting as the lead bank, solicited 20 additional financial institutions to jointly fund the loan.  CNB assumed the responsibility to administer the $35 million loan on behalf of the other 20 participating banks.  CNB itself contributed $1.5 million towards the $35 million loan that was to be used to purchase land and finance development costs related to RTC.

4.  On September 24, 2003, RTC and CNB entered into the "RTC Escrow Agreement" as part of the $35 million loan transaction.  The Escrow Agreement established an escrow account into which proceeds from the sale of RTC parcels would be deposited upon receipt by RTC.  The Escrow Agreement stated that "[CNB] shall . . . withdraw the quarterly interest payments when due [to the Participating Banks] from the Escrow Account."  The agreement further stated "[a]ll funds received by [RTC] from the sale of any parcel, lot, outlot[,] or other right, title[,] or interest in the Project, [were required to] be immediately deposited directly into the Escrow Account by [RTC]."  The agreement required that the defendants, on behalf of CNB, were required to immediately withdraw 80% of the deposited funds and apply those funds to the outstanding principal balance of the [$35 million] loan.

5.  On September 24, 2003, the $35 million participation loan closed.  The terms of the loan were specified in multiple contracts and agreements including a loan agreement, which set forth the terms governing the agreement between RTC and the participating banks; a combination revolving credit mortgage and security agreement, which set forth terms governing the collateral pledged by RTC as security for the $35 million loan; the revolving credit promissory note, which set forth the terms of repayment of the $35 million loan; and the loan participation agreement, which set forth the terms governing the relationship between CNB, as the lead bank, and the other participating banks.

6.  The "Combination Revolving Credit Mortgage, Security Agreement, Assignment of Rents and Fixture Financing Statement with Future Advance Clause" between RTC and CNB, which was executed in connection with the $35 million loan agreement, stated that RTC "will keep the Mortgaged Property free from all liens, encumbrances and security interests of every nature heretofore or hereafter arising . . . [.]"  The $35 million loan agreement required that RTC maintain a loan to value ratio at 75 percent or less.  The Ramsey Town Center Loan Agreement stated that Ramsey Town Center, "Shall not borrow [$1 million] or more in any single transaction without the prior written consent of Lender."

7.  On October 3, 2003, William Sandison, Ross Sandison and Jerry Peterson, in their personal capacities, provided Ramsey Town Center up to $990,000 as a line of credit in case RTC needed additional funding.  This additional loan was not disclosed to the participating banks.  The $990,000 loan agreement stated that RTC was required to pay William Sandison, Ross Sandison, and Jerry Peterson $29,700 (i.e., 3% of $990,000) "upon the first draw or advance on the Loan" as an origination fee.  The loan agreement also stated that RTC was required to pay William Sandison, Ross Sandison, and Jerry Peterson $300,000 as an additional origination fee.  However, RTC never paid William Sandison, Ross Sandison, or Jerry Peterson [the additional $300,000 origination fee].  The $990,000 line of credit was secured by a third mortgage on RTC, which was publicly recorded on October 17, 2003.

8.  On June 21, 2004, William Sandison, Ross Sandison, and Peterson advanced $617,000[1] from the line of credit to RTC to pay the $29,700 origination fee and an interest payment to the Participating Banks at a time before RTC had made sufficient sales revenue to fund the interest payment itself.

---

[1]At the evidentiary hearing, Sandison clarified that he actually advanced approximately $647,000 from the line of credit, not $617,000.  The amount actually advanced covered the $617,000 interest payment on the participation loan and the origination fee for the line of credit. The government, however, has agreed that it is bound by the terms of its stipulation.  The Court will therefore use the $617,000 figure contained in the stipulation.

9.  In August 2004, based on the representations made to CNB by RTC and Mr. Nedegaard that RTC was behind in meeting its financial obligations to contractors, the defendants and others formed Pentagon Credit, LLC, to provide a bridge loan to RTC for an additional $6 million so that RTC could pay its contractors and continue to operate.  The "Combination Revolving Credit Mortgage, Security Agreement, Assignment of Rents and Fixture Financing Statement with Future Advance Clause" between RTC and the Pentagon partners required RTC to:

> promptly pay, from time to time when the same shall become due, all claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part[] thereof, or on other revenues, rents, issues[,] and incoming profits arising there from.

The participating banks were not parties to the agreement and did not give prior consent to the terms of the agreement.

10.  Between August 10 and 19, 2004, William Sandison and Curtis Martinson discussed the terms of a letter to the Participating Banks.  William Sandison directed Martinson to send the letter they discussed to the Participating Banks, and [] Martinson prepared and sent the letter.  Specifically, the August 10, 2004 letter stated:

> The information above illustrates a cash flow timing issue for the Ramsey Town Center and a solution to this problem has been identified.  The existing sales including the Horton Option and upcoming sales as described in Exhibit C do not provide a quick enough cash flow for Ramsey Town Center to effectively pay its expenses as desired by the contractors and related accounts payable for this project.  To solve this timing of cash flow, a group of individuals (including the principals of Community National Bank) has been identified to provide bridge monies of up to $6,000,000.00 by financing the accounts payable of Ramsey Town Center.  In essence, the current payables of Ramsey Town Center would be paid for now with funding from this group.  The future collection of cash proceeds from sales would be paid entirely against the original loan as originally structured and then monies re-advanced from the original loan to repay the financial payables.

> This funding mechanism allows the developmental construction and infrastructure to continue as fast as possible during this early development stage.  This funding structure does not affect the

Bank or its participants in their collateral position or timing of any previously expected repayment.  It allows the project to move forward more quickly and covers the timing issue between current payables and expected sales.

The Funding group is not paid any interest or related fees at this time.  They will be receiving their interest and yield from future profits once the original loan has been paid in its entirety.  The funding group will be placing a mortgage on the property which will follow Community National Bank's first mortgage and second mortgage that was taken to secure the outstanding Letter of Credit to the City of Ramsey.

We anticipate this funding taking place by August 24, 2004.

11.  On September 22, 2004, the $6 million Pentagon loan (the fourth mortgage) closed.  Over the next few months, the defendants and their partners advanced $6,000,000 from Pentagon Credit to RTC to cover RTC's account[s] payable[].  As RTC sales began to be completed, funds began to flow into the RTC escrow account.

12.  Beginning December 24, 200[4], Community National Bank started using funds from the sale of RTC property to repay the $990,000 [line of credit].  On December 24, 2004, three payments of $40,000 each were made from the RTC escrow account to pay down the $990,000 line of credit.  On January 19, 2005, a payment of $240,000 from the escrow account was made to pay down the $990,000 line of credit.  On October 14, 2005, a payment of $287,000 from the escrow account was made to complete the repayment of the $990,000 line of credit.  Although required by the Escrow Service Agreement, RTC did not provide any documents to CNB in support of these disbursements.

13.  From December 24, 2004 through August 24, 2005, the $6 million Pentagon bridge loan was fully repaid by RTC.  The balance of the $15 million was used to pay additional development expenses for RTC.  These transactions never increased the original amount of funding proposed to the banks totaling $50 million.

14.  On April 5, 2005, the Participating Banks received a "Ramsey Town Center Update" which indicated that "[t]he interim funding source for Ramsey Town Center, Pentagon Credit, LLC has been reduced to $1,671,760.36 at the time of this update.  As you will recall, the injection of this funding source was to provide interim funding which allowed RTC to bridge the timing difference between development costs and sales.  The repayment of money to Pentagon

Credit, LLC has all flowed through the Banks['] loan as the loan documents stipulate and as Pentagon Credit, LLC has been reduced, the amount available to Ramsey Town Center under their credit line has also been reduced.  It appears that this interim source served its defined purpose and will not be needed in the future."  This document had attached an Addendum "A" that set forth the Ramsey Town Center Activity Tracking on the [$35 million] loan and indicated the payments to Pentagon, by date and amount of money.  On or about September 2005, the participating banks objected to the defendants' repayment of the Pentagon loan from the RTC $15 million line of credit.

     15.  In early 2006, Minnwest, another of the participating banks, assumed the role of "lead bank" from CNB.  On February 8, 2006, Minnwest, with prior notice to and the agreement of the other participating banks, closed a $2.13 million bridge loan to RTC, which was necessary to allow the RTC project to continue development.  Minnwest's $2.13 million bridge loan was secured by a mortgage on RTC's property.  Minnwest and Community National Bank participated in the funding of this additional bridge loan.  They used Powerhouse Title to close the loan transaction and perform the related title work.  Minnwest applied RTC's revenues from sales of RTC parcels to the $2.13 million bridge loan before applying such proceeds to the $35 million loan balance due and owing to the participating banks.

     16.  Ultimately, the RTC development failed and defaulted on the $35 million loan.  On June 26, 2009, the remaining RTC collateral was sold to the City of Ramsey for $6,750,000.  Netted from the proceeds were delinquent taxes along with other associated closing costs and servicing fees.  The lending banks split the remaining net proceeds of $4,799,880.57.

Stipulation of Fact [Docket No. 90].

## B. *Procedural Background*

Sandison and Martinson each pleaded guilty to one count of conspiring to commit bank fraud — Sandison on August 26, 2009, and Martinson on October 16, 2009.  The Probation Office circulated a draft presentence-investigation report ("PSR") for Sandison on December 11, 2009, and a draft PSR for Martinson on December 22, 2009.  Each defendant filed numerous objections to his draft PSR.  The Probation Office responded to those objections and circulated revised PSRs for the defendants in March 2010.  Each defendant then filed numerous objections

to his revised PSR — Sandison on April 9, 2010 [Docket No. 69] and Martinson on April 13, 2010 [Docket No. 73].   Each defendant made both legal and factual objections.

After months of negotiations, the government and the defendants filed the stipulation quoted above on November 11, 2010.  Docket No. 90.  That stipulation resolved some, but not all, of the defendants' factual objections.  The government further addressed the defendants' factual objections in a letter to the Court dated November 26, 2010.  Docket No. 96.

On November 30, 2010, the Court conducted a lengthy sentencing hearing to address the many unresolved legal and factual objections to the revised PSRs.  At the hearing, the defendants withdrew certain factual objections, and the government concurred with other factual objections made by the defendants.  At the conclusion of the hearing, all of the defendants' legal objections and a couple of their factual objections remained to be resolved.  At the Court's request, Martinson and the government filed post-hearing letters addressing one aspect of Martinson's objections.  Docket Nos. 99 and 100.

According to Sandison's revised PSR, the Sentencing Guidelines recommend a sentence of 70 to 87 months, based on an offense level of 27 and a criminal-history category of I. According to Martinson's revised PSR, the Sentencing Guidelines recommend a sentence of 57 to 71 months, based on an offense level of 25 and a criminal-history category of I.  By statute, though, the maximum term of imprisonment that can be imposed on either defendant is 60 months.  18 U.S.C. § 371.  The Court now turns to the defendants' objections.

## II.  DISCUSSION

### A. Legal Objections

Sandison and Martinson raise four legal objections to the PSRs' calculation of the sentences recommended by the Sentencing Guidelines.  First, both Sandison and Martinson object to the 18-level enhancement in ¶ 50[2] on the grounds that the amount of loss in this case is zero, and not (as the government contends) $6,617,000.  Second, Martinson objects to the two-level enhancement in ¶ 51 on the grounds that there were zero victims in this case, and not (as the government contends) at least 18 victims.  Third, Sandison objects to the two-level enhancement in ¶ 54 on the grounds that he was not an organizer or leader of the criminal offense.  Fourth, both Sandison and Martinson object to the two-level enhancement in ¶ 55 on the grounds that they did not abuse a position of public or private trust.  For the following reasons, the Court sustains these objections in part and overrules them in part.

### 1.  Amount of Loss

Paragraph 50 of the PSR adds 18 levels to Sandison's and Martinson's offense levels under § 2B1.1(b)(1)(J) of the Sentencing Guidelines.  Under that provision, an 18-level enhancement is applied if the loss exceeds $2,500,000 but does not exceed $7,000,000.  The amount of loss is the intended loss or the actual loss, whichever is greater.  USSG § 2B1.1 cmt. n. 3(A).  The government conceded at the sentencing hearing that the defendants did not *intend* to cause any loss to any of the participating banks.  Evid. Hrg. Tr. at 20.  That concession was well advised.  Clearly, Sandison and Martinson acted in an attempt to help the RTC project succeed and eventually repay all of its loans, including the $35 million participation loan.

---

[2]Unless otherwise specified, the relevant portions of the defendants' PSRs are identical.

Because Sandison and Martinson did not intend to cause any loss to the participating banks, the applicability of the 18-level enhancement turns on whether the participating banks suffered an *actual* loss as a result of Sandison and Martinson's crime.  "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense."  USSG § 2B1.1 cmt. n. 3(A)(i).  The Sentencing Guidelines provide that a court need not calculate the actual loss with precision, but merely "make a reasonable estimate." USSG § 2B1.1 cmt. n. 3(C).

The government contends that the defendants committed bank fraud in three ways:  First, the government alleges that the defendants committed bank fraud when, at the time that they extended the $990,000 line of credit, they hid the mortgage securing that line of credit from the participating banks.  Second, the government alleges that the defendants committed bank fraud when, at the time of the closing on the $6 million loan, they continued to hide the existence of the mortgage securing the $990,000 line of credit by implying that the mortgage securing the $6 million loan was the *third* mortgage on RTC property — when, in fact, it was the *fourth*.  Third, the government alleges that the defendants committed bank fraud when, faced with the possibility that the RTC project would fail, they jumped ahead of the participating banks to ensure that their personal loans to the developer — the $617,000 drawn against the line of credit and the $6 million loan — would be repaid before the $35 million participation loan.

The government has not even tried to prove that the first two instances of fraud caused a loss to the participating banks, and for good reason.  No one can know whether any participating bank lost money because the defendants hid — and then continued to hide — the existence of the mortgage securing the $990,000 line of credit.  The government suggests that, if the participating banks had known about the existence of that mortgage, they might have acted differently with

respect to the $35 million loan, such as by replacing CNB as the lead bank.  But this is sheer speculation.  It is just as likely that the participating banks would have raised no objection whatsoever.  After all, after Minnwest replaced CNB as the lead bank, the other participating banks readily agreed to a bridge loan that was to be repaid before the $35 million participation loan — and readily agreed to a new mortgage securing that bridge loan.  Stip. at ¶ 15.

Because the government cannot prove that the first two instances of fraud caused any loss, the government's contention that the defendants caused the participating banks to lose $6,617,000 rests solely on the third instance of fraud — that is, on the steps taken by the defendants to ensure that their personal loans would be repaid ahead of the $35 million participation loan.[3]  The government's argument is straightforward:  After loaning $6,617,000 to the RTC developer, the defendants diverted into their own pockets $6,617,000 of RTC funds that should have been used to benefit the participating banks — either by making $6,617,000 in payments on the $35 million participation loan or by investing $6,617,000 in the project, thereby increasing the value of the collateral securing the participation loan.  Therefore, the government contends, the participating banks suffered an actual loss of $6,617,000 when the defendants induced the RTC developer to repay them ahead of the participating banks.

---

[3]At the evidentiary hearing, Martinson argued that this third instance of fraud was not fraud at all.  Rather, according to Martinson, the only fraud committed by the defendants was hiding the existence of the mortgage securing the line of credit from the participating banks.  Evid. Hrg. Tr. at 132-33.  The Court disagrees.  In committing the third instance of fraud, the defendants devised a scheme whereby (1) the defendants would personally loan money to the RTC developer; (2) the developer would repay the loans before making payments that the developer was legally obligated to make to the participating banks; and (3) the developer and the defendants would hide from the participating banks the fact that the defendants' personal loans would be wrongfully repaid ahead of the participation loan.  The defendants therefore executed a scheme to defraud the participating banks in violation of 18 U.S.C. § 1344.

The Court disagrees.  The defendants have pleaded guilty to conspiring to commit bank fraud.  Bank fraud occurs when a defendant executes a "scheme . . . to defraud a financial institution."  18 U.S.C. § 1344.  To assess the amount of loss caused by such a scheme, the Court must consider the impact of the scheme as a whole.  The amount of loss caused by a scheme can be calculated only by comparing the victim's financial position after the scheme was executed with what the victim's financial position would have been had the scheme never been executed.

The problem with the government's calculation of the amount of loss caused by Sandison and Martinson is that the government divides their scheme into parts, ignores the part of the scheme that benefitted the participating banks, and considers only the part of the scheme that harmed the participating banks.  Put differently, the government calculates the amount of loss by comparing the participating banks' financial position after the scheme was executed with what the participating banks' financial position would have been if only *part* of the scheme had been executed.  The unfairness of the government's approach can be illustrated by an analogy.

Suppose that *A* and *B* hatch a scheme to defraud *C*.  Under the scheme, *A* and *B* will sell authentic Rolex watches to *C* at steep discounts — and then, after they have gained *C*'s trust, *A* and *B* will take advantage of that trust by selling fake Rolex watches to *C*.  Pursuant to the scheme, *A* and *B* first sell $25,000 worth of watches to *C* for $5,000.  *C* is impressed.  *A* and *B* then sell $100,000 worth of watches to *C* for $20,000.  *C* is again impressed.  Taking advantage of *C*'s trust, *A* and *B* then sell *C* a crate of worthless fake Rolex watches for $500,000 and abscond with the funds.

Using the approach that it has taken in this case, the government would calculate the amount of loss caused by *A* and *B* as $500,000.  Obviously, though, that would be unfair to *A* and

*B*.  Their scheme had two parts: (1) gain the trust of *C* by selling him authentic Rolex watches at

ridiculously low prices, and then (2) take advantage of that trust by selling *C* a large number of

fake Rolex watches.  In others words, the scheme involved both putting money into *C*'s pockets

and taking money out of *C*'s pockets.  Had the scheme never been executed, *C* would not have

paid $500,000 for the fake Rolex watches, but *C* also would not have received $125,000 worth of

authentic Rolex watches for $25,000.  Thus, the scheme resulted in *C* paying *A* and *B* a total of

$525,000, and *A* and *B* giving *C* merchandise worth $125,000.  The amount that *C* lost because

of the scheme is $400,000 — not (as the government would have it) $500,000.

Similarly, the scheme in this case had two parts:  (1) Sandison and Martinson loaned the

RTC developer $6,617,000; and (2) Sandison and Martinson arranged for the RTC developer to

repay the $6,617,000 loan before repaying the $35 million participation loan.  The two parts of

the scheme cannot be separated, for it is clear that Sandison and Martinson would not have gone

forward with the first part of the scheme (loaning $6,617,000 to the RTC developer) without

having in place the second part of the scheme (the RTC developer's promise to repay them

before the participating banks).  All evidence in the record suggests[4] — and the government does

not deny, Evid. Hrg. Tr. at 57 — that Sandison and Martinson would not have provided

---

[4]The loan documents are not entirely clear, but they generally support the conclusion that, at the time that the defendants loaned money to the RTC developer, the defendants expected to be repaid ahead of the participating banks.  The documents for the line of credit contain no information — one way or another — about when any money advanced under that line of credit must be repaid.  *See* Govt Exs. 9a and 9b.  But the documents for the $6 million loan require the RTC developer to fully repay that loan no later than December 31, 2005 — more than two months *before* the repayment deadline for the participation  loan.  Govt Ex. 14a ¶ 9; Govt. Ex. 6 at 2.

-14-

$6,617,000 to the RTC developer without first being assured that their loan would be repaid ahead of the $35 million participation loan.

Obviously, then, had the defendants' scheme never been executed, Sandison and Martinson would not have taken $6,617,000 from the RTC developer, and that money would have been spent for the benefit of the participating banks.  But had the defendants' scheme never been executed, Sandison and Martinson *also* would not have paid $6,617,000 *to* the RTC developer — money that (as explained below) was spent for the benefit of the participating banks.  It cannot be emphasized enough that Sandison and Martinson did not first loan $6,617,000 to the RTC developer and then, some months or years later, decide to defraud the participating banks by inducing the developer to repay their loan ahead of the participation loan.  If that had happened, this would be a different case; the defendants' scheme would have related solely to getting preexisting loans wrongfully repaid, and the amount of loss caused by the scheme would have been $6,617,000.  Rather, Sandison and Martinson provided $6,617,000 to the RTC developer only because the RTC developer first agreed to repay that loan ahead of the participation loan.  In short, Sandison and Martinson's scheme — like the scheme of *A* and *B* in the hypothetical described above — involved *both* giving money to the "victim" *and* taking money from the "victim."

To be sure, Sandison and Martinson provided $6,617,000 to the RTC developer, rather than to the victim banks — just as Sandison and Martinson later took payments from the RTC developer, rather than from the victim banks.  But just as each dollar taken from the RTC developer came out of the pockets of the participating banks, each dollar given to the RTC developer went into the pockets of the participating banks.  The RTC developer used the

$617,000 drawn against the line of credit to make an interest payment to the participating banks, Stip. ¶ 8; Evid. Hrg. Tr. at 13-14, and the RTC developer used the $6 million borrowed from Sandison and Martinson to pay subcontractors, Stip. ¶ 9.  If the RTC developer had not paid those subcontractors, the subcontractors would have placed $6 million in liens on RTC property. Thus, every single dollar that Sandison and Martinson loaned to the RTC ended up benefitting the participating banks — either directly (in the form of interest payments) or indirectly (in the form of reducing the amount of the liens on the collateral that the participating banks eventually sold after foreclosing on the participation loan).

The defendants' scheme is therefore unlike the offense in *United States v. Mancuso*, 42 F.3d 836 (4th Cir. 1994) and unlike the breach of fiduciary duty in *Helm Financial Corporation v. MNVA Railroad, Inc.*, 212 F.3d 1076 (8th Cir. 2000) — two cases that the government cites in support of its amount-of-loss theory.  The defendants in those cases only took money from their victims; they never provided money to their victims as part and parcel of their fraudulent schemes.  In this case, by contrast, the fraudulent scheme of Sandison and Martinson involved both (1) putting $6,617,000 into the pockets of the participating banks, and (2) taking $6,617,000 out of the pockets of the participating banks.  Thus, the amount of loss suffered by the participating banks as a result of Sandison and Martinson's scheme — the entire scheme, not just the part of the scheme on which the government focuses — was zero.[5]

---

[5]The government argues that, under § 2B1.1(b)(1) cmt. n. 3(B), the Court may use the amount of gain to the defendants as a proxy for the amount of loss to the victims.  But the Court may use the amount of gain as a proxy "only if there *is* a loss but [the loss] reasonably cannot be determined."  USSG § 2B1.1 cmt. n. 3(B) (emphasis added).  As just explained, Sandison and Martinson's crime — giving $6,617,000 to the RTC developer and taking $6,617,000 from the RTC developer — did not result in a loss to the participating banks.

(continued...)

Accordingly, ¶ 50 of the defendants' PSRs should be amended to omit the 18-level amount-of-loss enhancement.

### 2.   Number of Victims

Paragraph 51 of the defendants' PSRs applies a two-level enhancement pursuant to § 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines.  Under that provision, a two-level enhancement is appropriate when the offense had 10 or more, but fewer than 50, victims.  The PSR applied the enhancement based on a finding that there were at least 18 victim banks in this case.[6]  Sandison stipulated in his plea agreement to the inclusion of this two-level enhancement, but Martinson objects to the enhancement, arguing that, because he did not cause the participating banks to suffer any loss, the participating banks were not "victims" of his crime for purposes of § 2B1.1(b)(2)(A)(i).

The parties agree that, under the Eighth Circuit's decision in *United States v. Miller*, if the amount of loss is zero for purposes of § 2B1.1(b)(1), then "[i]t necessarily follows that there were no 'victims' within the meaning of § 2B1.1(b)(2)(A)(i)."  588 F.3d 560, 567-68 (8th Cir. 2009); *see also* Govt Ltr. at 1-2 [Docket No. 100]; Martinson Ltr. at 1-2 [Docket No. 99].  The government further agrees that, although Sandison stipulated to the enhancement in his plea

---

[5](...continued)
Moreover, even if Application Note 3(B) applied, the Court would reach the same conclusion, for the amount of *gain* to Sandison and Martinson was zero.  Again, Sandison and Martinson paid $6,617,000 to the RTC developer and got $6,617,000 back from the RTC developer.  They did not enjoy a gain.  Indeed, because Sandison and Martinson borrowed the money that they loaned to the RTC from United Bankers Bank — and because the defendants had to repay United Bankers Bank with interest — Sandison and Martinson actually *lost* money as a result of their crime.

[6]Martinson's PSR states that there were at least 20 victim banks, Martinson PSR ¶ 51; Sandison's PSR states that there were at least 18, Sandison PSR ¶ 51.

agreement, the Court nevertheless should not apply the enhancement to him if it finds that no

loss occurred.  Govt. Ltr. at 2.[7]  Paragraph 51 of the two PSRs should therefore be amended to

eliminate the two-level enhancement for the number of victims.

### 3.  Organizer or Leader Role

Paragraph 54 of Sandison's PSR applies a two-level role enhancement to Sandison

pursuant to § 3B1.1(c).  Under § 3B1.1(c), a two-level enhancement is to be applied "[i]f the

defendant was an organizer, leader, manager, or supervisor" of the offense.  For purposes of this

enhancement, the Court must construe the terms "manager" and "supervisor" broadly, and the

enhancement may be applied even if the defendant directed the actions of only one other

participant.  *United States v. Umanzor*, 617 F.3d 1053, 1060 (8th Cir. 2010).

Sandison objects that he was not an organizer, leader, manager, or supervisor of the

criminal activity, but merely a co-equal participant.  The Court disagrees.  Sandison (who was the

president of CNB) and Martinson (who worked under Sandison as a vice president of CNB) have

pleaded guilty to conspiring to commit bank fraud.  In furtherance of this conspiracy, Martinson

sent a materially misleading letter dated August 10, 2004, to the participating banks.  Sandison

Plea Agreement at 3; Change of Plea Tr. at 31.  Sandison admits that he directed Martinson to

send the misleading letter.  Stip. at ¶ 10; Change of Plea Tr. at 31.  Because Sandison admits that

he directed Martinson (his subordinate) to commit an act in furtherance of the conspiracy,

---

[7]The Court commends the government for this concession, which the government did not
have to make, but which it made in the interest of fairness.

Sandison's offense level should be increased by two levels under § 3B1.1(c).[8]   The Court

overrules Sandison's objection with respect to this enhancement.

4.   Abuse of Trust

Paragraph 55 of the PSR applies a two-level abuse-of-trust enhancement as to both

Sandison and Martinson.  Under § 3B1.3 of the Sentencing Guidelines, a two-level enhancement

is appropriate "[i]f the defendant abused a position of public or private trust . . . ."  USSG

§ 3B1.3.  A position of public or private trust is "characterized by professional or managerial

discretion (i.e., substantial discretionary judgment that is ordinarily given considerable

deference)."  USSG § 3B1.3 cmt. n. 1.  Individuals who hold positions of public or private trust

"ordinarily are subject to significantly less supervision than employees whose responsibilities are

primarily non-discretionary in nature."  *Id*.  Once the sentencing court determines that a person

occupies a position of trust, the court must then determine whether the position of trust

"'contributed in some significant way to facilitating the commission or concealment of the

offense' before the enhancement may apply."  *United States v. Waldner*, 580 F.3d 699, 706 (8th

Cir. 2009) (quoting USSG § 3B1.3 cmt. n. 1).  An abuse-of-trust enhancement is warranted, for

example, in the case of a bank executive's fraudulent loan scheme, but is not warranted in the

case of embezzlement by a bank teller.  USSG § 3B1.3, cmt. n.1.

As an initial matter, the Court agrees with Sandison and Martinson that, *at the time the

participation loan closed*, they did not hold positions of trust with respect to the participating

---

[8]The Court notes that there is considerable additional evidence that Sandison acted as an organizer, leader, manager, or supervisor of the criminal activity.  The Court need not discuss this additional evidence, however, as Sandison's conduct in directing Martinson to send the August 10, 2004 letter — conduct that Sandison has admitted — is itself sufficient to warrant application of a two-level enhancement under § 3B1.1(c).

banks (with the exception of CNB, where they were officers). The participation loan was an arms-length transaction, and the participating banks did not place any particular trust in the defendants. *See, e.g.*, Saxena Aff. Ex. A [Docket No. 62-1] (in which the participating banks expressly agree that they were "not relying upon [CNB's] judgment, and that [CNB] . . . made no warranty of any kind, express or implied, in connection with the Loan or . . . regarding the legality, perfection, enforceability, or priority of any security interests, mortgages, guaranties, or similar documents issued in connection with the Loan.").

But once the participation loan closed and CNB began administering it, CNB (and its officers, including Sandison and Martinson) did hold a position of trust with respect to the other participating banks. The participation agreement granted CNB broad discretion to "administer the Loan and any related security and guaranties as though it were the sole owner and holder" of the loan and to "make all decisions concerning the servicing of the Loan." Govt. Ex. 2 at ¶ 12A ("Participation Agreement"). CNB was to provide the participating banks updates on the loan, including "any factual information bearing on the Borrower's continuing credit worthiness." Participation Agreement ¶ 10. The participation agreement further provided that CNB "will use the same degree of care in servicing and collecting the Loan as it would for its own accounts." Participation Agreement ¶ 12B. Under the participation agreement, CNB and the other participating banks "will promptly notify each other should either receive actual notice or knowledge of any . . . change in financial condition of any Obligor under the Loan, which will have a material adverse effect upon continuation of payments under the Loan or its repayment on default." Participation Agreement ¶ 18.

In short, the participation agreement contemplated that, once the participation loan closed, the participating banks would trust and rely upon CNB's officers — including Sandison and Martinson —  to act honestly in servicing and collecting the loan and in keeping the participating banks apprised of material facts regarding the loan.  Sandison and Martinson abused the trust placed in them by the participating banks when they failed to keep the participating banks apprised of the loan's status, did not tell the participating banks that the RTC was taking on additional encumbrances, and did not act honestly in servicing and collecting the loan. Because the defendants abused their position of trust with respect to the other participating banks, application of a two-level enhancement under § 3B1.3 is warranted.

Even if Sandison and Martinson did not hold a position of trust with respect to *all* of the participating banks, they unquestionably held a position of trust with respect to *one* of the participating banks:  CNB.  *See United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994) (bank officer and director occupied a position of trust with respect to her employer bank).  When the defendants defrauded the participating banks, they defrauded CNB, and when they defrauded CNB, they abused the trust that had been placed in them by CNB.

In sum, the Court finds that both Sandison and Martinson abused a position of private trust vis-a-vis the participating banks generally and vis-a-vis CNB specifically.  The Court therefore overrules Sandison's and Martinsons' objection to application of the two-level enhancement under § 3B1.3.

### B. Restitution

The defendants object to the PSRs' assertion in ¶ 43 that they owe $6,617,000 in restitution. The Court sustains the objection. As the Court has explained at length, the defendants did not cause a loss to the participating banks, and thus they are not required to pay restitution to those banks. Accordingly, ¶ 43 of the PSRs should be amended to reflect that neither defendant owes restitution.

### C. Factual Objections

The Court ruled on a number of the defendants' factual objections at the November 30 hearing. The reasons for those rulings are reflected in the transcript of that hearing.[9] Two factual objections remained unresolved at the conclusion of the hearing.

First, Sandison objects to the heading for ¶¶ 25-28 of his PSR — "Misapplication of Funds" — on the grounds that there was no loss and no misapplication of funds. The Court determines that a ruling on this objection is unnecessary because this heading "will not affect sentencing." Fed. R. Crim. P. 32(i)(3)(B). The Court is well aware of the facts of this case; it will not be influenced by the words used in the headings of the PSR.

Second, Sandison objects to ¶¶ 29-31 of the PSR. Sandison argues that "many" of the statements in these paragraphs "are simply incorrect" because he did not mislead the Office of the Comptroller of Currency ("OCC") about the $6 million loan, as the PSR reports. Sandison Pos. on Sent. at 10. The government disagrees with Sandison's objection. At the hearing, the

---

[9] For the reasons discussed on the record at the November 30 hearing, the Court sustains Martinson's objection to ¶ 31 and directs that the PSRs be amended to clarify that the Office of the Comptroller of Currency was concerned that the $6 million loan created a conflict of interest between the defendants and CNB, not between the defendants and the other participating banks.

parties agreed that the Court could resolve Sandison's objection in light of the parties' written factual stipulation and government exhibits 15, 16, and 31.  After careful review of the relevant materials, the Court overrules Sandison's objection.

As an initial matter, although Sandison objects to ¶¶ 29, 30, and 31, his objection seems to apply to only ¶ 30 because only that paragraph suggests that Sandison misled the OCC with respect to the $6 million loan.  Specifically, ¶ 30 states that in August 2004, Sandison made false and misleading statements to OCC examiners when he claimed that "'not a penny' would go to payment of the $6 million loan until all of the participating banks were paid in full first."  PSR ¶ 30.  According to Sandison, the evidence shows that his representations to OCC examiners regarding the $6 million loan were true — or, at worst, that the evidence is ambiguous.

Sandison is correct that some of the evidence is ambiguous.  For example, the Asset Quality Review Sheet completed by an OCC examiner in August 2004 — essentially a compilation of the examiner's notes of his investigation — states that "B.[]Sandison stated no interest or [sic] has been collected to date and none will until the bank is paid out."  Gov't Ex. 15 at 1.  A word is plainly missing from the sentence after "interest or."  Interest or what?

Sandison contends that the examiner most likely meant to write that "no interest *or fees* has been collected to date and none will until the bank is paid out."  Such a statement from Sandison would have been consistent with the language that Martinson used in the August 10, 2004 letter to the participating banks — the letter that Sandison directed Martinson to send. Gov't Ex. 12 at 3 (stating that the lenders on the $6 million loan were "not being paid any interest or related fees at this time.").  If the OCC examiner meant to write in the Asset Quality Review Sheet that Sandison represented to him that the RTC developer would not pay interest *or*

*fees* on the $6 million loan, Sandison argues, then that must mean that Sandison was silent as to when the RTC developer would repay the *principal*.  And if Sandison said only that no interest or fees would be paid ahead of the $35 million participation loan, then Sandison spoke the truth:  In accordance with the agreement governing the $6 million loan, RTC was not obligated to pay interest or fees on the $6 million loan before paying off the $35 million loan.  *See* Gov't Ex. 14a ¶¶ 9-10.

Sandison's argument is highly speculative.  It seems as likely that the OCC examiner meant to write "no interest or *principal* has been collected to date and none will until the bank is paid out" as it is that he meant to write "no interest or *fees* has been collected to date and none will until the bank is paid out interest or fees."  Indeed, the former may be more likely, given that it is grammatical; one would not normally say "no interest or fees *has* been collected."  More importantly, though, Sandison's argument is contradicted by the testimony given by the OCC examiner before the grand jury.  The OCC examiner testified that Sandison told him that the $35 million participation loan would be repaid in full before any payments of any kind would be made on the $6 million loan:

> Q:     Were you concerned about who had priority on payments [as between the participation loan and the $6 million loan]?
>
> A:     Right.  That was my primary concern is who gets paid first and how is the six million dollar loan structured so we could assess repayment ability of the project and how the bank was going to get repaid.
>
> Q:     And did you bring that up with Mr. Sandis[]on?
>
> A:     Yes.
>
> Q:     And what if anything did Mr. Sandis[]on tell you?

A:      I'm paraphrasing, but he did not think I needed to see the detail, the loan agreement on the six million dollar loan because it is not, and I'm paraphrasing, something to the extent that it's not a bank loan, that I have no reason to look at it and beyond a scope of my authority.

Q:      Did you ever ask him who would get paid first, the RTC credit or the six million dollar loan?

A:      I did ask him and he assured me, and I'm paraphrasing again, but not a penny would go to anyone else but the bank until the bank is paid out in full.

Q:      And what did that mean to you?

A:      What that meant was that he was suggesting that that [sic] this was truly sub-debt, that — and usually in cases of sub-debt the — that is the last entity to be paid out.

Q:      So all the money that comes in, and I'm translating or interpreting for you, but correct me if I'm wrong, all the money that comes in goes to the RTC credit first and when that's paid off then they start paying on the six million dollar?

A:      That's what I, verbally that's what he told me.

Gov't. Ex. 31 at 18-19.[10]

This exchange supports the PSRs' factual assertion that Sandison made false and misleading statements to the OCC.  According to the OCC examiner, Sandison told him that "not a penny would go to anyone else but [the participating banks]" until the participating banks were paid in full.  That was a lie; Sandison knew that many millions of "pennies" would go to

---

[10]The grand-jury testimony of the OCC examiner is consistent with another portion of the Asset Quality Review Sheet, which describes the "[c]apital injections via loans . . . from private third parties" as "sub debt" — i.e., as debt that would not be repaid until the participation loan was fully repaid.  Govt. Ex. 15 at 1.

Sandison, Martinson, and the other lenders on the $6 million loan before the participation loan was repaid.

The OCC examiner also testified before the grand jury that Sandison told him the same thing that Martinson told the participating banks in the August 10, 2004 letter — namely, that:

> they're [i.e., the lenders on the $6 million loan] not going to receive any interest or fees at this time.  And receive interest in yield from further profits once the original loan has been paid in its entirety.  And that's verbally what Bill told me [too].

Gov't Ex. 31 at 21-22.  This later testimony is somewhat ambiguous, but it certainly does not contradict the OCC examiner's earlier testimony that Sandison told him that no payments would be made on the $6 million loan before the $35 million participation loan had been repaid.

Based on the evidence in the record, the Court finds that the government has shown, by the preponderance of the evidence, that Sandison falsely and misleadingly told the OCC that no payments of any kind would be made on the $6 million loan until the participation loan had been repaid in full.  Therefore, the Court overrules Sandison's objection to ¶ 30 of his PSR.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  The objections of defendant William Garfield Sandison [Docket Nos. 58 and 69] and defendant Curtis Alan Martinson [Docket Nos. 61 and 73] to their respective presentence-investigation reports are SUSTAINED IN PART and OVERRULED IN PART as described in this order and during the November 30, 2010 hearing.

2.      The Probation Office is directed to revise the presentence-investigation reports to
incorporate the rulings made in this order and from the bench at the November 30,
2010 hearing.

Dated: April  22 , 2011                                  s/Patrick J. Schiltz
                                                        Patrick J. Schiltz
                                                        United States District Judge